UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

MICHELLE L. WOOTEN,                    :          Case No. 3:11-cv-13
                                       :
        Plaintiff,                     :          Judge Timothy S. Black
                                       :
vs.                                    :
                                       :
COMMISSIONER OF                        :
SOCIAL SECURITY,                       :
                                       :
        Defendant.                     :

**AMENDED ORDER THAT: (1) THE ALJ'S FINDING OF NON-DISABILITY IS
NOT SUPPORTED BY SUBSTANTIAL EVIDENCE AND IS HEREBY
REVERSED;   AND (2) JUDGMENT IS TO BE ENTERED IN FAVOR OF
PLAINTIFF AWARDING BENEFITS**

This is a Social Security disability benefits appeal.  At issue is whether the

administrative law judge ("ALJ") erred in finding Plaintiff "not disabled" and therefore

unentitled to supplemental security income ("SSI") and disability insurance benefits

("DIB").  (*See* Administrative Transcript ("Tr.") (Tr. 12-27) (ALJ's decision)).

## I.

On May 9, 2006, Plaintiff filed an application for SSI and DIB alleging that she

became disabled on June 15, 2004, due to depression.  (Tr. 142, 147).  The applications

were denied initially on October 2, 2006.  (Tr. 81, 84).

Plaintiff filed another application for disability insurance and SSI benefits on April

5, 2007, again alleging an onset date of disability of June 15, 2004.  (Tr. 151, 158).  The

claims were denied initially and on reconsideration.  (Tr. 87, 90, 96, 100).  Upon denial of

her claims on the state agency levels, Plaintiff requested a hearing *de novo* before an ALJ. A hearing was held on April 6, 2010, at which Plaintiff appeared with counsel and testified. (Tr. 36-73).

On April 16, 2010, the ALJ entered his decision finding Plaintiff not disabled because she could perform other work.[1] (Tr. 9-35). Plaintiff appealed the ALJ's denial to the Appeals Council. (Tr. 8, 272-77). The Appeals Council denied review in a decision dated November 18, 2010, making the decision of the ALJ the final decision of the Commissioner. (Tr. 1-5).

At the time of the remand hearing, Plaintiff was a 29-year-old female with a high school education. (Tr. 25). Her past relevant work experience was as a fast food worker, stocker/cashier, and childcare attendant. (Tr. 65, 171, 256). Plaintiff was fired from her part-time work at McDonalds. "I stopped showing up for work or I would leave early. The customers would make me cry and I would go in the back room and, and I would cry and then I wouldn't want to go back." (Tr. 42). The ALJ found that Plaintiff could not perform any of her past relevant work, and the vocational expert testified that there were no transferable skills. (Tr. 25, 69).

---

[1]    In his decision, the ALJ adjudicated the entire period without invoking *res judicata*. Accordingly, the prior applications were *de facto* reopened. *Crady v. Sec'y of HHS*, 835 F.2d 617, 620 (6th Cir. 1987). Under the regulations, a determination may be reopened within 12 months of the date of the notice of the initial determination for any reason. 20 C.F.R. §§ 404.1988(a), 416.1488(a).

The ALJ's "Findings," which represent the rationale of his decision, were as follows:

1.    The claimant met the insured status requirements of the Social Security Act through September 30, 2008, but not thereafter.

2.    The claimant has not engaged in substantial gainful activity since June 15, 2004, the alleged disability onset date (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*).

3.    The claimant has the following severe impairment: depression (20 CFR 404.1520(c) and 416.920(c)).

4.    The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5.    After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform at least light work as defined in 20 CFR 404.1567(b) and 416.967(b) except that she can never climb ladders, ropes, or scaffolds or perform repetitive bending or twisting at the waist. She must avoid all exposure to hazards. Her work must involve no more than simple, one-or two-step tasks requiring little, if any, concentration: no contact with the general public; and only low stress jobs, defined as only limited contact with co-workers and supervisors, no teamwork, no production quotas, and no over-the-shoulder supervision.

6.    The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7.    The claimant was born on March 19, 1975, and was 29 years old, which is defined as a "younger individual age 18-49," on the alleged disability onset date (20 CFR 404.1563 and 416.963).

8.    The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9.  Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not she has transferable job skills. (*See* DDR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10.  Considering her age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569(a), 416.969, and 416.969(a)).

11.  The claimant has not been under a disability, as defined in the Social Security Act, from June 15, 2004, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

(Tr. 14-27).

In summary, the ALJ concluded that Plaintiff was not under a disability as defined by the Social Security Regulations and was therefore not entitled to SSI or DIB. (Tr. 27). On appeal, Plaintiff argues that the ALJ erred in his evaluation of the treating psychiatrist and other medical source opinion.

## II.

The Court's inquiry on appeal is to determine whether the ALJ's non-disability finding is supported by substantial evidence. 42 U.S.C. § 405(g). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales,* 402 U.S. 389, 401 (1971). In performing this review, the Court considers the record as a whole. *Hephner v. Mathews,* 574 F.2d 359, 362 (6th Cir. 1978). If substantial evidence supports the ALJ's denial of benefits, that finding must be affirmed, even if substantial evidence also exists in the record upon

which the ALJ could have found plaintiff disabled.  As the Sixth Circuit has explained:

> "The Commissioner's findings are not subject to reversal
> merely because substantial evidence exists in the record
> to support a different conclusion.  The substantial evidence
> standard presupposes that there is a "zone of choice" within
> which the Commissioner may proceed without interference
> from the courts.  If the Commissioner's decision is supported
> by substantial evidence, a reviewing court must affirm."

*Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994).

The claimant bears the ultimate burden to prove by sufficient evidence that she is

entitled to disability benefits.  20 C.F.R. § 404.1512(a).  That is, she must present

sufficient evidence to show that, during the relevant time period, she suffered an

impairment, or combination of impairments, expected to last at least twelve months, that

left her unable to perform any job in the national economy.  42 U.S.C. § 423(d)(1)(A).

### A.

The relevant medical record reflects that:

Plaintiff has a long history of psychiatric problems with treatment for depression

and suicide as a teen.  (Tr. 283).  In January 2005, Plaintiff began regular treatment at

TCN Behavioral Health Services.[2]  When she was evaluated for a partial hospitalization

program her activity was somewhat slowed, her speech was very soft, her mood was

depressed, and she was anxious and irritable.  Plaintiff also reported auditory

---

[2]    Plaintiff was first seen at TCN in February 2002, where she was diagnosed with
major depression, recurrent and severe with psychosis and panic disorder without agoraphobia.
These diagnoses were affirmed in September 2002 when she underwent another assessment.
(Tr. 337-45).  She was also evaluated in June 2004, but did not follow through with treatment.
(Tr. 319, 329).

hallucinations telling her to hurt herself.  (Tr. 427).  She was treated in a partial

hospitalization program over the next three weeks.  (Tr. 302-18, 866-84).  Plaintiff

continued in group sessions and individual counseling.  (Tr. 423/866, 422/863-64).

Plaintiff underwent an adult diagnostic assessment at TCN in February 2005 to

assess her needs for further treatment.  She reported constant anxiety attacks, was

paranoid, and heard voices telling her what to do.  (Tr. 351, 354).  She showed some

obsessive behaviors and reported needing to "get towels in order."  She was diagnosed

with major depression, recurrent severe with psychotic features, and assigned a GAF of

50.[3]  She was placed on medications and began receiving help from a case manager

through Community Psychiatric Supportive Treatment ("CPST") to help her with social

stressors, such as homelessness.  (Tr. 350, 412).

When Plaintiff was seen in follow-up in May 2005 by the psychiatric nurse

practitioner, Cynthia VanAusdal, Plaintiff indicated that she still felt paranoid and wanted

all windows and doors locked.  (Tr. 362, 500-02).  Plaintiff noted that she did not like

being out in public, felt anxious, and still had racing thoughts.  (Tr. 362).

Plaintiff continued to receive services from a case manager for help with

coordinating services and was also seen regularly by a nurse to help her understand and

---

[3] The Global Assessment of Functioning is a numeric scale used by mental health
clinicians and physicians to subjectively rate the social, occupational, and psychological
functioning of adults.  41-50 indicates moderate symptoms (*e.g.*, flat affect and circumstantial
speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school
functioning (*e.g.*, few friends, conflicts with peers or co-workers).

remain compliant with medications. (Tr. 400-11, 490-91, 845). In July 2005, she continued to report racing thoughts. (Tr. 845). In August 2005, Plaintiff reported feeling more depressed and had difficulty stopping negative thoughts. She was feeling more fearful, especially when leaving her house. (Tr. 487). Ms. VanAusdal increased Plaintiff's medications, and when seen in follow-up a month later, Plaintiff reported that her moods were slightly improved and she was sleeping better. (Tr. 362, 483, 488).

The state agency sent Plaintiff to George O. Schulz, Ph.D. for a psychological evaluation on October 21, 2005. (Tr. 839-899). Dr. Schulz diagnosed a major depression, recurrent, severe with psychotic episodes and a GAF of 50. (Tr. 897-98). Dr. Schulz thought that Plaintiff's ability to withstand the stress and pressures associated with day-to-day work activity was moderately to severely impaired.[4]

In early October 2005, Plaintiff's mother reported that Plaintiff was sleeping all the time and isolating herself. (Tr. 396). The case manager assisted Plaintiff with her pharmacological follow-up and found her panicked, nervous, and shaking. The case manager had to assure Plaintiff that her housing was not in jeopardy to calm her down. (Tr. 391). Plaintiff continued to report that she heard voices and her thoughts raced daily. (Tr. 476).

A state agency psychologist, Guy Melvin, Ph.D., reviewed the file in January 2006

---

[4]    "She shows moderate to severe mental limitations in her ability to manage stress associated with relating with others or handling stress related to carrying out work related tasks with adequate pace and perseverance particularly over a prolonged period of time including an eight-hour day or five day workweek." (Tr. 899).

and found moderate difficulties in maintaining social functioning, but concluded that Plaintiff could perform routine, repetitive tasks. (Tr. 830, 840). However, Plaintiff continued to report auditory hallucinations with racing thoughts that interfered with concentration. She did not want to continue therapy because "All I did was cry." (Tr. 469).

One month later, Plaintiff reported that she felt restless with nervous energy in her hands and legs. (Tr. 465). Her medications were again adjusted. (Tr. 361, 464, 466). Plaintiff continued to experience problems, and in February 2006 noted that she was hearing voices all day long. (Tr. 361). Because Plaintiff had difficulty managing her medications, she was assigned a nurse to prepare her medication box weekly. (Tr. 449).

By late April, Plaintiff reported that she was feeling like her "old self." (Tr. 447). She was not hearing things as often and better able to focus and concentrate. (Tr. 446). She continued to report hearing voices every day, but not as often. (Tr. 443). Plaintiff's condition remained somewhat stable over the next few months, although symptoms increased with increased social stressors.

Plaintiff continued to receive her medications on a weekly basis from a nurse at TCN. (Tr. 430-35, 55550-51, 553, 555, 558). In August 2006, Plaintiff was able to shift to a biweekly schedule. (Tr. 548). Plaintiff reported an increase in nightmares and depression. (Tr. 546, 548). In November 2006, she still reported depression and her case manager noted that Plaintiff was frequently confused about paperwork from Social Security and housing authorities. (Tr. 521-28, 586-98).

-8-

In May 2007, the file was reviewed again by the State agency psychologist, Kevin Edwards. Dr. Edwards concluded that Plaintiff "can relate adequately to familiar others and small groups – less so with the public. She can sustain mental performance for at least SRT [simple, repetitive tasks]. She can adapt to routine work in a stable setting." (Tr. 562). This opinion was affirmed in September 2007. (Tr. 599).

While Plaintiff's moods were better in June 2007, in July 2007 she reported having violent dreams and had put sheets on her kitchen door window because she felt others were watching her. (Tr. 584, 592).

In September 2007, Plaintiff began seeing Valerie Houseknecht, M.D., a psychiatrist at TCN. At that time, Plaintiff reported an increase in broken sleep and that she was also having an increase in anxiety and panic attacks and had stopped driving because of these attacks. Her anxiety increased over the summer when she had her kids, but it continued even after they went back to their father's house. She reported episodes of depression where she dreaded getting out of bed. (Tr. 681). Her auditory hallucinations (the voice of an imaginary friend that began when abused as a child) increased with her depression. Dr. Houseknecht suspected that the voice was dissociative in nature, secondary to post-traumatic stress disorder ("PTSD"). (Tr. 682).

Plaintiff continued to be monitored by the nursing staff for preparation of medications and a case manager. She missed a home visit with the case manager because she didn't want to open the door. (Tr. 675-76). When she met with Dr. Houseknecht in

-9-

October 2007, her depression had increased and she reported being a "hermit" for the prior two weeks. She did not want to see others and was more withdrawn.

In January 2008, Plaintiff reported an increase in anxiety attacks, racing thoughts, and dreams. (Tr. 653). In February 2008, the case manager noted that Plaintiff presented with a depressed affect and reported that symptoms of depression, anxiety, and isolating behaviors were increasing. (Tr. 649). When the case manager visited Plaintiff's home in late March, Plaintiff had forgotten the appointment, and showed confusion over the forms. (Tr. 644). Plaintiff saw Dr. Houseknecht again in mid-April and reported an increase in panic attacks such that she now had them daily, although her depressive symptoms were better. Plaintiff noted that auditory hallucinations increased in the winter with the depressed symptoms.

Two weeks later, Plaintiff reported having increased panic. She "freaked out" at a picnic and had to spend most of the day upstairs in the house. (Tr. 638). By mid-May, she reported her panic was constant due to increased stressors. (Tr. 636). In June, she noted she was having nightmares that her daughter was going to kill her. (Tr. 748). When Plaintiff saw Dr. Houseknecht in late June, she reported feelings of hypervigilance.

On July 9, 2008, Dr. Houseknecht completed reports concerning Plaintiff's ability to perform the mental demands of work. Dr. Houseknecht confirmed that Plaintiff suffered form a Major Depressive Disorder, recurrent severe with psychotic features. (Tr. 686). Because of these problems, Dr. Houseknecht noted that Plaintiff's ability to

-10-

perform the mental demands of work on a regular and continuing basis was limited. (Tr. 685-96). Specifically, Dr. Houseknecht noted that Plaintiff was unable to:

- Be prompt and regular in attendance;

- Respond appropriately to supervision, co-workers and customary work pressures;

- Withstand the pressure of meeting normal standards of work productivity and work accuracy without significant risk of physical or psychological decompensation or worsening of symptoms;

- Behave in an emotionally stable manner;

- Relate predictably in social situations;

- Demonstrate reliability;

- Perform activities within a schedule, maintain regular attendance and be punctual within customary tolerances;

- Complete a normal workday and work week without interruption form psychologically and/or physically based symptom or perform at a consistent pace;

- Respond appropriately to changes in a routine work setting;

- Get along with co-workers or peers without unduly distracting them;

- Work in coordination with, or in proximity to, others without being unduly distracted by them;

- Accept instructions and respond appropriately to criticism from supervisors.

(Tr. 688-93).

Dr. Houseknecht noted that Plaintiff's impairments "stem primarily from her severe anxiety and mood symptoms which inhibit normal function and social interaction

-11-

(i.e. can't leave house alone, frequently missed app[ointmen]ts)." (Tr. 687). Dr. Houseknecht noted that Plaintiff was easily stressed or upset and symptoms would likely increase if she were corrected. (Tr. 688). Dr. Houseknecht noted that Plaintiff did not respond well to changes, and that when there were staffing changes at the agency, Plaintiff's symptoms increased to the point that she isolated herself and refused contact for a month. (Tr. 692). In general, Plaintiff's symptoms appeared to increase under stress and/or pressure. "It is highly likely that a work environment would increase these symptoms." (Tr. 690). Dr. Houseknecht concluded that Plaintiff had poor or no ability to: deal with the public, deal with work stresses, or demonstrate reliability. (Tr. 695-97). Dr. Houseknecht also noted that Plaintiff had a case manager who would help her manage her benefits. (Tr. 697).

When Plaintiff saw the psychiatrist again in November 2008, she reported an increase in depression. She was more withdrawn, lethargic, and experienced crying spells. (Tr. 721). Plaintiff returned to the psychiatrist in February with an increase in mood swings and was easily irritable. In March 2009, Dr. Houseknecht noted that Plaintiff was still isolating herself, keeping her blinds closed due to her fear that someone was trying to hurt her. (Tr. 706). In April 2009, she reported increasing paranoia. She was late to her appointment because she felt compelled to "refold her blankets in the closet a certain way." (Tr. 702).[5]

---

[5]    In 2007, Plaintiff's mother reported that when Plaintiff did the laundry, she had to fold the clothes almost perfectly and that she had gotten up during the middle of the night to refold towles and sheets over and over. (Tr. 212).

The ALJ sent Plaintiff for another psychological evaluation in November 2009, this time with Michael W. Firmin, Ph.D. (Tr. 751-57). Dr. Firmin noted that Plaintiff's mood was downcast and pessimistic. She reported continued auditory hallucinations and obsessive symptoms. Dr. Firmin diagnosed a Major Depressive Disorder, recurrent, moderate, chronic; and obsessive-compulsive disorder; a panic disorder with agoraphobia; avoidant personality disorder. Dr. Firmin assigned a GAF of 40.[6] (Tr. 755). Dr. Firmin noted that Plaintiff had marked impairment in her ability to: interact appropriately with the public, supervisors, and co-workers; respond appropriately to usual work situations and to changes in a routine work setting. Dr. Firmin also noted a moderate impairment in her ability to: understand, remember and carry out simple instructions; make judgments on simple work-related decisions; make judgments on complex work-related decisions. (Tr. 758-59).

At the hearing in April 2010, Plaintiff testified that she has depression, which affects her ability to socialize. She noted that she does not like to go places or do things and just wants to stay home. (Tr. 47). She only likes being around her mother, son, and daughter. (Tr. 54). Plaintiff is able to take care of household chores; however, she is somewhat compulsive in organizing drawers and closets. "I do a lot of counting and like my towels have to be blue, yellow, blue, yellow. I check on my towels maybe eight times

---

[6]     A GAF of 31-40 suggests some impairment in reality testing or communication (e.g., speech is at times illogical, obscure, or irrelevant) OR major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (*e.g.*, depressed man avoids friends, neglects family, and is unable to work; child frequently beats up younger children, is defiant at home, and is failing at school).

a day." (Tr. 55, 61). Plaintiff's mother helps her pay the bills and takes her grocery shopping once a month. (Tr. 58).

Plaintiff maintains that the ALJ erred in his evaluation of the treating psychiatrist and other medical source opinions. It is well established that the findings and opinions of treating physicians are entitled to substantial weight.[7] "In general, the opinions of treating physicians are accorded greater weight than those of physicians who examine claimants only once." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 530-31 (6th Cir. 1997); *see also Harris v. Heckler*, 756 F.2d 431, 435 (6th Cir. 1985) ("The medical opinions and diagnoses of treating physicians are generally accorded substantial deference, and if the opinions are uncontradicted, complete deference."); *King v. Heckler*, 742 F.2d 968, 973 (6th Cir. 1984); *Lashley v. Sec'y of Health & Human Servs.*, 708 F.2d 1048, 1054 (6th Cir. 1983).

Likewise, a treating physician's opinion is entitled to weight substantially greater than that of a non-examining medical advisor. *Harris*, 756 F.2d at 435 (if not contradicted by substantial evidence, a treating physician's medical opinions and diagnoses are afforded complete deference). If a treating physician's "opinion on the issue(s) of the nature and severity of [a claimant's] impairment(s) is well-supported by

---

[7]     The Social Security regulations recognize the importance of longevity of treatment, providing that treating physicians "are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations." 20 C.F.R. § 404.1527(d)(2).

medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case," the opinion is entitled to controlling weight. 20 C.F.R. § 1527(d)(2); *see also Walters*, 127 F.3d at 530.

Where a treating physician's opinion cannot be given controlling weight, then it must be weighed under a number of factors set forth in the regulations – "namely, the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and the specialization of the treating source – in determining what weight to give the opinion." *Wilson v. Comm'r*, 378 F.3d at 544 (citing 20 C.F.R. §404.1527(d)(2)). Opinions of one-time examining physicians and record-reviewing physicians are also weighed under these same factors, including supportability, consistency, and specialization. *See* 20 C.F.R. §404.1527(d), (f); *see also* Social Security Ruling 96-6p.

In this case, Dr. Houseknecht, the treating psychiatrist, provided a detailed opinion concerning Plaintiff's ability to perform the mental demands of work on a regular and continuing basis. (Tr. 685-96). Additionally, Dr. Houseknecht found that Plaintiff had a marked restriction in activities of daily living, marked difficulties in maintaining social functioning, and slight deficiencies in concentration. (Tr. 694). Dr. Houseknecht concluded that Plaintiff had poor or no ability to: deal with the public, deal with work stresses, or demonstrate reliability. (Tr. 695-97).

The ALJ acknowledged Dr. Houseknecht's reports, but concluded that his opinion deserved "some, but not great, weight." (Tr. 23-24). The ALJ felt that Dr. Houseknecht's opinion was unsupported by medical signs and findings in treatment notes because "Plaintiff's mood was typically euthymic, and noted as stable." (Tr. 24). The ALJ also felt that Dr. Houseknecht's conclusion that Plaintiff was markedly impaired in daily activities and social functioning were contradicted by other reports in the record. (Tr. 24-25). This Court disagrees.

Dr. Houseknecht's explanations are well supported by the record. For example, Dr. Houseknecht noted that Plaintiff's impairments "stem primarily from her severe anxiety and mood symptoms which inhibit normal function and social interaction (i.e. can't leave house alone, frequently missed app[ointmen]ts)." (Tr. 687). Records document varying degrees of paranoia and concerns about people watching her and problems leaving the house.[8] Plaintiff missed appointments on several occasions at TCN as a result of these phobias. (Tr. 331-34, 381, 383, 489, 534, 554, 556, 585, 595, 597,635, 643, 665, 675, 701, 714, 852, 925, 994, 1002). Dr. Houseknecht also noted that Plaintiff does not respond well to changes and that when there were staffing changes at

---

[8]    *See, e.g.,* Tr. 346 (doesn't want to leave her house – thinks people are evil); 362 (feels paranoid and wants doors and windows locked); 396 (mother called to say client isolating self); 419 (upset by blinds being opened because feels people are watching her); 473 (fearful of being around people); 487 (increased fear when leaving house); 584 (put sheets on kitchen door window because feels other watching her); 638 (freaked out at a picnic and had to spend most of the day upstairs due to panic); 672 (doesn't want to see others, more withdrawn); 706 (still isolating, keeping blinds closed secondary to fear someone is trying to hurt her);724 (doesn't like to be alone at home); 728 (increased social phobia); 731 (still isolating).

the agency, Plaintiff's symptoms increased to the point that she isolated herself and refused contact for a month. (Tr. 692). Dr. Houseknecht noted that Plaintiff was easily stressed or upset and symptoms would likely increase if she were corrected.[9] (Tr. 688). "It is highly likely that a work environment would increase these symptoms." (Tr. 690).

There is no question that Plaintiff's condition has, during short periods, improved. However, what Dr. Houseknecht's opinion makes clear, and the records document, is that Plaintiff's periods of improvement are not sustained. This is exactly the reason that Social Security's regulations favor the opinion of the treating physician who has had a greater opportunity to examine and observe the patient and is generally more familiar with the patient's condition than other physicians. *See, Walker v. Sec'y of Health & Human Services*, 980 F.2d 1066, 1070 (6th Cir. 1992).

Rather than giving the greatest weight to the opinion of Dr. Houseknecht, the ALJ gave significant weight to the opinions of Drs. Schulz, Melvin, and Edwards "as their opinions are supported by medical signs and findings upon examination and are generally consistent with the objective findings in the treatment notes from TCN." (Tr. 22). Drs. Melvin and Edwards were non-examining, state agency reviewing psychologists, who

---

[9]     *See, e.g.,* Tr. 391 (afraid housing in jeopardy and case manager noted literally had a panic attack); 399 (due to poor thought processes, kept repeating what was previously stated); 414 (kicked out of mom's house now with increased hallucinations and depression); 436 (increased anxiety with children for the summer); 465 (racing thoughts on legal troubles resulting in increased anxiety); 492-500 (homeless, feeling anxious); 521 (increased anxiety with extra responsibility of boyfriend's child); 522 (confused and anxious over forms); 639 (panic attack after argument with mother); 679 (increased anxiety due to stressors); 681 (anxiety increased with children and did not go away when left; stopped driving due to panic attacks); 743 (increase in stressors resulting in increased anxiety, depression, hypervigilance).

reviewed the file in 2006 and 2007. (Tr. 559-76, 820-33, 838-41). A non-examining

physician report is entitled to less weight than the reports of other physicians who

examined the claimant. *Allen v. Califano,* 613 F.2d 139, 145 (6th Cir.1980) ("In

determining the question of substantiality of evidence, the reports of physicians who have

treated a patient over a period of time or who are consulted for purposes of treatment are

given greater weight than are reports of physicians employed and paid by the government

for the purpose of defending against a disability claim"). This is especially true where the

State agency psychologists did not have the entire record for their review. *See* Social

Security Ruling 96-6p (the supportability of state agency physician opinion must be

weighed against new evidence submitted to the ALJ).[10]

Dr. Schulz evaluated Plaintiff in October 2005 and assigned a GAF score of 50,

indicative of serious symptoms. (Tr. 897-98). While Dr. Schulz did not identify

impairment in Plaintiff's ability to relate to others, he believed that Plaintiff's ability to

withstand the stress and pressures associated with day-to-day work activity was

moderately to severely impaired. "She shows moderate to severe mental limitations in

her ability to manage stress associated with relating with others or handling stress related

to carrying out work related tasks with adequate pace and perseverance particularly over a

prolonged period of time including an 8 hour day or 5 day work week." (Tr. 899).

---

[10]     Defendant argues that Dr. Houseknecht had less of the record for her review than the
state agency reviewing psychologist. However, Dr. Houseknecht was a staff psychiatrist at TCN,
where Plaintiff had received treatment for a number of years before beginning treatment with Dr.
Houseknecht. Defendant's assumption that Dr. Houseknecht had not reviewed Plaintiff's
treatment history at her own facility is unsupported by any facts in the record.

The ALJ also claimed to give "some weight" to the assessment of Dr. Firmin, another one-time consultative examiner. Dr. Firmin assessed a GAF of 40, but the ALJ dismissed this finding as "a subjective estimate by a clinician of the claimant's status in the preceding two weeks." (Tr. 23). Despite the GAF score, Dr. Firmin recognized that Plaintiff was markedly impaired in her ability to respond appropriately to changes in a routine work setting and to interact appropriately with the public, supervisors, and co-workers. (Tr. 759).

The ALJ appeared to give little weight to the opinion of Dr. Houseknecht because the ALJ felt that Plaintiff's "treatment history" was inconsistent with a finding of disabling mental symptoms. (Tr. 21). The ALJ seemed particularly bothered by the fact that Plaintiff did not want to see a therapist at TCN. (*Id.*) Plaintiff noted that when she saw a therapist before, "he wanted me to talk about things I didn't want to talk about and it made me very upset so I didn't want to go back." (Tr. 48). Particularly, the therapist wanted her to talk about her childhood abuse. (Tr. 72).[11] In focusing on the lack of therapy, the ALJ believed that Plaintiff's mental health treatment was "limited," despite the plethora of services Plaintiff received, including psychiatric care, nursing support for medication management, and a case manager for psychosocial support. Indeed, between January 2005 and October 2009, Plaintiff was seen by TCN staff over 200 times. (Tr. 292-362, 380-428, 430-504, 519-58, 582-98, 632-84, 701-50, 842-92, 920-26, 994-1003).

---

[11] At the time of the hearing, Plaintiff was on a waiting list to get back into therapy. (Tr. 48).

In sum, the ALJ's failure to give greater weight to the opinion of Dr. Houseknecht

was error, given its consistency with the record as a whole, including the opinions of the

consultative examiners.  The non-examining psychologists' assessments, based in part on

incomplete factual findings, does not constitute *substantial evidence*, so as to overcome

the findings of the treating physician.[12]

## III.

When, as here, the non-disability determination is not supported by substantial

evidence, the Court must decide whether to reverse and remand the matter for rehearing

or to reverse and order benefits granted.  The Court has authority to affirm, modify or

reverse the Commissioner's decision "with or without remanding the cause for

rehearing."  42 U.S.C. § 405(g); *Melkonyan v. Sullivan*, 501 U.S. 89, 100 (1991).

Generally, benefits may be awarded immediately "only if all essential factual issues

have been resolved and the record adequately establishes a plaintiff's entitlement to

benefits." *Faucher v. Sec'y of Health & Human Servs.*, 17 F.3d 171, 176 (6th Cir. 1994);

*see also Abbott v. Sullivan*, 905 F.2d 918, 927 (6th Cir. 1990); *Varley v. Sec'y of Health*

*& Human Servs.*, 820 F.2d 777, 782 (6th Cir. 1987).

The Court may award benefits where the proof of disability is strong and opposing

evidence is lacking in substance, so that remand would merely involve the presentation of

---

[12] "A claimant is disabled if he cannot perform full-time work.  SSR 96-8p, 1996 SSR
LEXIS 5." *Criner v. Barnhart*, 208 F. Supp.2d 937, 956 n.21 (N.D. Ill. 2002); *Gotz v. Barnhart*,
207 F. Supp.2d 886, 897 (E.D. Wis. 2002). "[P]art-time work does not constitute working on a
'regular and continuing' basis." *Carr v. Apfel*, No. 3:97cv7515, 1999 U.S. Dist. LEXIS 21202 at,
*5 (N.D. Ohio 1999).

cumulative evidence, or where the proof of disability is overwhelming.  *Faucher*, 17 F.3d at 176; *see also Felisky*, 35 F.3d at 1041; *Mowery v. Heckler*, 772 F.2d 966, 973 (6th Cir. 1985).  Such is the case here.

Here proof of disability <u>is</u> overwhelming and remand will serve no purpose other than delay.  As fully recited herein, in view of Plaintiff's assertions of disability, the extensive medical record of evidence of disability, and the credible and controlling findings and opinions of Plaintiff's psychiatrists, proof of disability is overwhelming; moreover, there is an absence of evidence supporting a finding of medical improvement.

## IV.

Accordingly, the decision of the Commissioner, that Plaintiff was not entitled to disability insurance benefits and supplemental security income beginning on June 15, 2004, is found **NOT SUPPORTED BY SUBSTANTIAL EVIDENCE**; **REVERSES** the ALJ's no-disability finding and **REMANDS** this matter to the Social Security Administration for the calculation and award of benefits; and as no further matters remain pending for the Court's review, this case is **CLOSED**.

**IT IS SO ORDERED.**

Date: 3/2/12

Timothy S. Black
United States District Judge

-21-